[Civil No. 3445.  Filed January 21, 1935.]

[39 Pac. (2d) 938.]

THE LIGHTNING DELIVERY COMPANY, a Corporation, Appellant, v. SARA V. MATTESON, Appellee.

Messrs. Elliott & Lewis and Messrs. Clark & Clark, for Appellant.

Mr. Frank H. Lyman and Mr. Ben L. Rudderow, for Appellee.

McALISTER, J.—This is an action by Sara V. Matteson against the Lightning Delivery Company to recover possession of certain goods and chattels or their value. The case was heard by the court sitting without a jury, and from a judgment for the plaintiff and an order denying a motion for a new trial, the defendant appeals.

The facts shown by the record are substantially these: The plaintiff, her husband, William F. Matteson, and their only child, a daughter eleven years of age, came to Phoenix early in 1931. On September 26th of that year, and in contemplation of a separation following domestic troubles, they divided their household goods, furniture, guns, fishing tackle and personal effects, packed them in boxes and barrels, labeled those containing the plaintiff's with her name and those containing William F. Matteson's with his name and placed them in storage with the defendant, which was in the warehouse and transfer business in Phoenix. The husband had a son by a former marriage, Murray M. Matteson, to whom certain articles were given by him and the plaintiff and these were also packed in boxes and barrels, labeled with his name and placed in storage at the same time and place. Three receipts were issued by the defendant, one to each of the persons in whose name the goods had been placed in storage.

On January 29, 1932, William F. Matteson called at the defendant's place of business and asked for delivery to him of the goods in his name and also those in the name of Sara V. Matteson. The defendant released to him those in his name, but refused to deliver the goods in the name of Mrs. Matteson. Im-

mediately thereafter, however, it sent to the latter at East San Diego, California, the following telegram:

"Wire immediately authority to release your goods to William Matteson.
"LIGHTNING DELIVERY COMPANY.
"Charges Lightning Delivery Company."

This message was delivered to plaintiff that evening at eight o'clock. She did not answer it by wire, but two or three days later, that is, on February 2d, wrote the defendant acknowledging receipt of the telegram and requested it to write her an explanatory letter regarding the matter. Before this was received, however, to wit, on January 30th, the defendant delivered the goods in her name to William F. Matteson.

In surrendering them to him the defendant acted upon the following telegram, which it received from San Diego that day and was, it thought, an answer to its wire to Mrs. Matteson the day before:

"Lightning Delivery Company,
"Phoenix, Arizona.
"Deliver storage goods in my name to Wm. F. Matteson.
"SARA V. MATTESON.
"Attorney-in-fact MURRAY MATTESON."

Within a very short time after delivery of the goods, the record not being clear whether it was one day or several, Murray M. Matteson, as attorney-in-fact for plaintiff, receipted for the articles in question by placing upon the copy of the warehouse receipt retained by the defendant when it issued the original to plaintiff under this printed language, "Phoenix, Arizona—Received from Lightning Delivery Co. in good order, all the articles described on the face of this receipt," this wording: "Sara V. Matteson by Murray M. Matteson Atty-in-fact." Just before this receipt was signed the defendant was

shown, either by its attorney or by Murray M. Matteson, the following power of attorney which had been executed by the plaintiff and the defendant in Phoenix, Arizona, June 9, 1931:

"Know all men by these presents, that we William F. Matteson and Sara V. Matteson, his wife, of Edgewater Beach, Edgewater, Maryland, have made, constituted and appointed, and by these presents do make, constitute and appoint Murray M. Matteson, of Edgewater Beach, Edgewater, Maryland, our true and lawful attorney for us and in our name, place and stead.

"Legally to buy, sell, mortgage, exchange, and in anywise legally dispose of any and all properties, real, personal and mixed, belonging to us, wherever located. To collect and receipt for any and all debts owing to us and represent us generally in all property matters, giving and granting unto our said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in, and about the premises as fully to all intents and purposes, as we might, or could do if personally present; with full power of substitution and revocation, hereby ratifying and confirming all that our said attorney or his substitute shall lawfully do, or cause to be done, by virtue hereof."

Early in March, 1932, the plaintiff, with her warehouse receipt in her possession, went to the defendant's place of business, tendered the storage charges due and demanded her goods, but the defendant was unable to and did not deliver them. Thereupon she brought this action, which resulted in a judgment in her favor in the sum of $1,500, and it is this judgment that defendant asks this court to review.

At the trial the defendant sought to introduce in evidence the telegram of January 30th from Murray Matteson, as attorney-in-fact for Sara V. Matteson, which, it claimed, was in reply to the one it sent plaintiff the day before, but an objection to it was

sustained, and this action forms the basis for one of the assignments. The court refused to admit it on the ground that the authority of the agent could not be shown by the declarations of the agent himself. This is a correct statement of the law, 21 R. C. L. 821, paragraph 6, and justified the ruling of the court at that time, and there was no development later in the trial that rendered it admissible upon the theory that the agency of Murray M. Matteson was otherwise shown, unless it be that the power of attorney had this effect. Notwithstanding this, however, its introduction would, it occurs to us, have aided the plaintiff, because it was signed by one purporting to be the attorney-in-fact of the person under whose name the property had been stored, rather than by that person herself, and this should have led the defendant to inform itself fully as to the extent of the authority under which that person acted, before surrendering the goods upon the strength of his authorization alone. By accepting his statement that he was the agent of the plaintiff and acting on it, the defendant assumed whatever risk such action carried with it; if it guessed right and the power to authorize the release of the goods and receipt for them had in fact been conferred upon Murray Matteson it would not be liable for any loss the plaintiff might suffer as a result thereof, but if it guessed wrong and the power given did not include this authority its responsibility for such loss would be clear. One dealing with an agent is presumed to know the extent of the power under which he acts and cannot escape the consequences of his own interpretation of it. *Gilbert* v. *How,* 45 Minn. 121, 47 N. W. 643, 22 Am. St. Rep. 724.

██ Realizing this the defendant introduced in evidence the power of attorney executed by her and her husband in June, 1931, for the purpose of showing that he had been authorized by that instrument to

act for her in accepting the goods and receipting for them and that this power still rested in him on January 30, 1932. And this being true, it contends that the fact that it may have acted in the absence of positive knowledge that this power existed was immaterial, the important circumstances being that the authority had been conferred on him and had not been revoked, and, consequently, that it was not responsible for any loss she might have suffered as the result of releasing the goods to him or upon his order. Clearly the liability of the defendant depends upon the answer to the question whether the power of attorney did in fact authorize Murray Matteson to act in the premises for Sara V. Matteson.

It will be observed that the plaintiff and her husband by that instrument appointed and constituted Murray M. Matteson "our true and lawful attorney for us and in our name, place and stead" and empowered him "legally to buy, sell, mortgage, exchange, and in anywise legally dispose of any and all properties, real, personal and mixed, belonging to us, wherever located." The words "we," "us" and "our" are used throughout the instrument and because of this fact the parties interpret it differently, the defendant contending that its language authorizes the agent to handle the separate as well as the joint property of the principals and the plaintiff that it refers to property owned by them jointly and none other. It must be kept in mind that under all the authorities powers of attorney should be strictly construed and that the courts should never by construction extend the power they confer beyond that given in terms, or is absolutely necessary to carry that conferred into effect. *Gilbert* v. *How, supra.* Whatever may have been the acts the power of attorney authorized Murray M. Matteson to perform, it seems clear that it was intended to empower him to deal with the

property of William F. Matteson and Sara V. Matteson owned jointly and not with that either of them owned separately and alone. The terms, "we," "us" and "our," convey this impression, and the fact that it authorized him to handle all the property they owned together, instead of some particular parcel, in no way lessens the force of this proposition. Such was the holding in the leading case of *Gilbert* v. *How, supra*. The facts there were that a deed in which Mary A. Clarke and B. F. Bucklin were named as the grantors, and George A. Bucklin as grantee, had been executed by B. F. Bucklin in person, and by Franklin Chase in behalf of and as attorney-in-fact for Mary A. Clark, who was the sole owner of the land conveyed. The power of attorney under which the agent assumed to act was joint, having been executed by Mary A. Clarke and B. F. Bucklin and having stated that they appointed and constituted Frank Chase "our true and lawful attorney for us, and in our names" to do the things therein named. In holding that it did not authorize Chase to sell her separate property the court used the following language:

"The power under which Chase pretended to convey a tract of land, the sole property of Mary A. Clarke, must be construed as authorizing him to convey such lands, only, as were held and owned by his two constituents jointly, or in common, and not the lands held and owned by either, and separately. By its terms, the attorney was not empowered to convey land held and owned as the undivided property of one, and in which the other had no interest, nor was he given authority to transact any business, except that in which the parties were jointly concerned. The authority was special, and the written power joint, in form. No mention was made of the separate property or business of either of the parties who executed it, and it cannot be inferred that they intended to confer upon Chase the power to convey such property, or to transact such business. *Dodge* v. *Hop-*

*kins,* 14 Wis. 686; *Johnston* v. *Wright,* 6 Cal. 373. This rule is also recognized in *Holladay* v. *Daily,* 19 Wall. 606 [22 L. Ed. 187], although the point was not directly in issue.''

The most recent expression we have been able to find on the subject is by the American Law Institute in its Restatement of the Law of Agency, and it is to the same effect. In section 41 of that work the rule is stated and its meaning illustrated with two sets of facts so clear and so nearly the same as those with which we are here concerned that, coming as it does from an authority which the bench and bar of the country regard as the highest, it is decisive of the proposition. The language of that section reads as follows:

''(1) Unless otherwise agreed, authority given by two or more principals jointly includes only authority to act for their joint account.

''Illustrations of Subsection (1):

''1. P and B own a number of tracts of land as tenants in common; each also individually owns other tracts of land. P and B give A a written power of attorney, authorizing him to 'sell and convey all our land.' A is authorized only to sell the land held by P and B as tenants in common.

''2. P and B constitute a partnership owning and using in the business several automobiles; each also individually owns other cars. Together they visit a secondhand car dealer, A, who knows the facts, and direct him to 'sell all our automobiles.' A is authorized to sell only the partnership cars.''

There is nothing here showing it was ''otherwise agreed,'' hence it follows that Murray M. Matteson was authorized by the power of attorney to handle only the property which the plaintiff and her husband owned jointly, and this includes, in Arizona, the interest of both in their community holdings.

The defendant calls our attention to a decision by the Supreme Court of California, *Cousino* v. *Western*

*Shore Lumber Co.*, 179 Cal. 1, 175 Pac. 406, which sustains the opposite view. That opinion, it is true, holds as the defendant contends, but the cases upon which it relies, other than two former holdings of the same court, are, it occurs to us, in line with the view announced in *Gilbert* v. *How,* and in the Restatement of the Law of Agency, rather than with those they were cited to sustain. One of these is *Holladay* v. *Daily,* 19 Wall. (86 U. S.) 606, 610, 22 L. Ed. 187, in which Ben Holladay and his wife gave one Hughes a joint power of attorney to sell certain real property situated in the City of Denver, Colorado, and belonging to Holladay alone. The court held that it authorized Hughes to dispose of the property and convey title, stating that while special powers of attorney should be strictly construed so as to sanction only such acts as are clearly within its terms, the object of the parties should always be kept in view, and where the language conferring the power will permit, give it such a construction as will carry out, instead of defeat, the purpose of the appointment, and that since the sole object of the power of attorney in that case was to enable Hughes to pass the title free from any possible claim of the wife, a consummation that could be brought about under the laws of Colorado by the deed of the husband alone as completely as it could by the wife's joining in the conveyance, there could be no question but that the deed passed title. This was true, the court said, because in Colorado the "right of dower of the widow attaches only to lands of which the husband dies seized." And in each of the three later cases in Minnesota, which the court stated modified the rule announced in *Gilbert* v. *How, supra,* the joint power of attorney conferred upon an agent the authority to sell the property in which the principals "may now or hereafter be in any way interested," and the Minnesota court held that this authorized the sale by the agent of the separate

property of the husband for the reason that the wife's inchoate right of dower in the land gave her a sufficient interest therein to bring the sale within the purview of the power granted the agent, that state evidently being one of those in which she could not be divested of that right without her consent. 9 R. C. L. 582 and 583. This, it occurs to us, was not a modification of *Gilbert* v. *How,* but rather in support of it.

The property in question was personalty acquired during coverture and the defendant contends that under the last sentence of section 2172, Revised Code 1928, stating that "during the coverture personal property may be disposed of by the husband only," William F. Matteson had full power to handle it. The preceding portion of this section defines community property and this sentence was inserted to give the husband the power to dispose of the community personalty during the existence of the marital relation. *La Tourette* v. *La Tourette,* 15 Ariz. 200, 137 Pac. 426, Ann. Cas. 1915B 70. But it has no reference whatever to the separate property of the wife. That is taken care of in section 2174 of the same Code, which provides that "married women shall have the sole and exclusive control of their separate property, and the same shall not be liable for the debts or obligations of the husband, and may be sold, mortgaged, conveyed, or bequeathed by them as if they were unmarried." When, therefore, the plaintiff and her husband divided the property between them on September 26, 1931, in contemplation of a separation, its status was changed from that of community to that of separate property (*Schofield* v. *Gold,* 26 Ariz. 296, 225 Pac. 71, 37 A. L. R. 275), and the power of the husband to dispose of it alone no longer existed.

The judgment of the superior court is affirmed.

LOCKWOOD, C. J., and ROSS, J., concur.